IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| DIANA F. WELLS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 04-0793-CV-W-ODS |
| ) | |
| SCI MANAGEMENT, L.P., et al., ) | |
| ) | |
| Defendants. ) | |

ORDER AND OPINION GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Pending is Defendants' Motion for Summary Judgment. For the following reasons, the motion (Doc. # 37) is granted.

I. BACKGROUND

Plaintiff's Amended Complaint alleges she was terminated based on her gender and in retaliation for filing a prior charge of discrimination. Defendant SCI Missouri Funeral Services, Inc. ("SCI Missouri") operates numerous funeral homes in Kansas City, Missouri. Defendant SCI Funeral and Cemetery Purchasing Cooperative, Inc., is a management company that provides SCI Missouri with legal, financial, and human resources advice. Though named in the original Complaint (and therefore named in the caption of this case), SCI Management, L.P., was not named in the Amended Complaint and therefore is no longer a party to the case. Both Defendants are subsidiaries of Service Corporation International.

In September 1981, Plaintiff began working as an apprentice funeral director/embalmer for a different subsidiary of Service Corporation International in Houston, Texas. While there, she advanced to the position of funeral director. In May 1990, Plaintiff began working as a funeral director for SCI Missouri at a funeral home in St. Louis, Missouri. On December 31, 1995, Plaintiff was promoted to Regional Vice President of Revenue Services. Approximately two years later, Plaintiff was assigned

the same position for a different region, which necessitated a move to Kansas City, Missouri. In March 1999, Plaintiff's position was eliminated and Plaintiff was given a position as a funeral director at Mt. Moriah, a funeral home in Kansas City. Her duties at Mt. Moriah included conducting the initial meeting with families seeking funeral services; Plaintiff generally did not conduct the services themselves.

Plaintiff's employment has been marked by complaints from customers. Plaintiff disputes the accuracy and tone of some of those complaints and defends her conduct, but there is no doubt that complaints were made to Plaintiff's superiors. In April 1999, a representative from the <u>Kansas City Star</u> contacted Jim Siegert (one of SCI Missouri's Area Managers) and complained that Plaintiff had been rude and yelling at staff in connection with the manner in which the newspaper planned to word a particular obituary. In May 1999, the McMillan family complained Plaintiff had been argumentative and untruthful and demonstrated a "lack of compassion." Siegert and another Area Manager (Ana Cruz) spoke with the McMillan family. Later, Siegert and Plaintiff discussed the McMillan family's complaints – along with complaints received from at least three other families – and Siegert issued a written warning to Plaintiff about her conduct. Additional complaints were received in January 2000 (from the Miller family) and February 2000 (the Edmond family).

In January 2001, three employees at Mt. Moriah complained to Jerry Griffin (Mt. Moriah's General Manager) that Plaintiff was rude, unprofessional and disruptive. Griffin interviewed other employees to determine if others felt the same way and found three additional employees who echoed the original complaints. Griffin reported the complaints to SCI Missouri's Regional Vice President (Dave Haas). Haas reviewed Griffen's report, as well as a complaint from yet another family (the Dahl family) who described Plaintiff as "at best abrasive in tone and manner." In light of these complaints, as well as the incident involving the McMillan family, Haas suspended Plaintiff without pay for five days and warned her that further problems would result in her termination. Plaintiff filed administrative complains with the EEOC and the Missouri Human Rights Commission, contending her suspension was based on her gender. Both agencies declined to take action, and Plaintiff did not pursue the matter further.

2

Plaintiff's immediate supervisor at Mt. Moriah, Matt Roening, prepared her 2002 evaluation. Roening rated Plaintiff's performance as a "2" (on a scale of one to five, with five being the highest) in the areas of (1) tact, courtesy and efficiency in working with people inside and outside the company and (2) ability to address and resolve problems with others. Roening also orally discussed the need for Plaintiff to be a "team player" and work with her fellow employees. In April 2003, Plaintiff received a rating of "good" for her "ability to work with peers," but written comments indicated Plaintiff needed to "watch how you interact with staff – take a moment." In October 2003 one of Plaintiff's co-workers began calling the CareLine (a phone line established to allow employees to report workplace problems), complaining Plaintiff was calling him "slow" and "stupid." Griffin and Mark McGilley (SCI Missouri's Regional President) investigated the matter. During approximately that same time period, another family complained Plaintiff had been argumentative.

In the Fall of 2003, SCI Missouri determined that it needed to restructure, and a reduction in force ("RIF") was to be part of this restructuring. As part of the RIF, McGilley's position was eliminated and he accepted a transfer to the position of Marketing Director for the Kansas City and Wichita areas. In this position, McGilley was expected to increase profitability and meet certain expense margins. He analyzed the financial conditions of each of the funeral homes in his area and also determined the number of funerals per funeral director. McGilley's analysis demonstrated that Mt. Moriah was below expectations in terms of operating margin, above average in salary expenses. McGilley also determined that the number of funerals per funeral director in his region was below the industry norm. McGilley determined that five funeral directors should be terminated as part of the RIF.[1] In selecting Plaintiff to be one of the five to be

---

[1] Plaintiff disputes the financial analysis, but the record does not. For instance, Plaintiff argues Mt. Moriah's margin was increasing. Even if this is so, that does not mean that it was not also below expectation.

Relying on an employee newsletter, Plaintiff also contends the RIF was supposed to target only management-level employees. While streamlining the management structure was identified as an objective of the RIF, the newsletter does not state only management employees would be terminated.

3

terminated, McGilley considered her personnel record as well as the fact that she was the highest paid funeral director at Mt. Moriah. Of the other four funeral directors terminated, three were men. In total, McGilley eliminated nine positions as a result of the RIF; four were men and five were women. Two of the men applied for and received lower-paying jobs; the record does not reflect whether any of the other seven terminated employees applied for other jobs with SCI Missouri.

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir. 1992). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### A. Gender Discrimination

Plaintiff first claims her gender was a factor in her termination. To survive summary judgment, Plaintiff must first present a prima facie case of discrimination, which requires proof in the record demonstrating "(1) she was a member of a protected

4

group, (2) she was meeting the legitimate expectations of her employer, (3) she suffered an adverse employment action, and (4) there are facts that permit an inference of discrimination." Zhuang v. Datacard Corp., 414 F.3d 849, 854 (8th Cir. 2005). However, "[i]n reduction in force (RIF) cases, a plaintiff must make some additional showing that gender was a factor in her termination." Hesse v. Avis Rent A Car System, Inc., 394 F.3d 624, 631 (8th Cir. 2005). Plaintiff has failed to establish a prima facie case of discrimination.

The Court will assume, for the sake of argument, that Plaintiff can establish the first three components of the prima facie case. The undisputed facts in the record are devoid of anything that will permit an inference Plaintiff's gender was a factor in her termination. SCI Missouri determined that a reduction in force was necessary. As part of that RIF, McGilley was moved to a position that required him to maximize the profits for funeral homes in the region encompassing Kansas City and Wichita. McGilley's analysis persuaded him that SCI Missouri had five more funeral directors than were necessary, so he terminated five funeral directors. In determining Plaintiff should be one of the five funeral directors to terminate, McGilley considered factors including the history of customer complaints filed against her and the fact that she was the highest paid funeral director at Mt. Moriah (a location McGilley identified as having a sub-par profit margin). Of the five funeral directors terminated, three were men. Nothing about this sequence of events suggests Plaintiff's gender was a factor in her termination.

Plaintiff unsuccessfully attempts to compare herself to other employees, but those to whom she compares herself are not similarly situated. Plaintiff identifies employees who had customer complaints filed against them, but none had as many as were filed against Plaintiff. Similarly, Plaintiff identifies male employees who received poor performance appraisals who were not fired. However, those employees had different supervisors and there is no indication these employees were even funeral directors. Most importantly, Plaintiff was not fired for poor performance; she was fired for economic reasons, and in deciding which individuals to terminate Defendants were entitled to consider a variety of factors that, absent the RIF, would not have brought about an employee's termination. It must also be remembered Plaintiff had no right to

5

be terminated for cause; thus, regardless of the truth of the customer and employee complaints and the comments placed on customer comment cards, Plaintiff had no right to keep her job until the complaints were proved to her satisfaction. Plaintiff also suggests she endured gender-based comments from certain co-workers, but (1) Plaintiff does not present a hostile environment claim, (2) none of the statements were made by McGillley or any other management employee, and (3) there is no connection between these statements and Plaintiff's termination.

Plaintiff presents many arguments challenging the wisdom of the RIF and the wisdom of firing her instead of other employees. The Court does not "sit as a super-personnel department to review the wisdom or fairness of . . . job-elimination policies during the RIF." Wallace v. Sparks Health Sys., 415 F.3d 853, 860 (8th Cir. 2005). Consequently, Plaintiff's arguments are not cognizable. Plaintiff also argues her termination was not part of the RIF because the RIF targeted management employees. Plaintiff's sole support for this position is her interpretation of the company newsletter, which contains a rather long but general statement about the company's need to streamline management, improve lines of communication and reduce costs but never states only management employees would be eliminated. Moreover, regardless of whether Plaintiff was terminated pursuant to (1) the company-wide RIF or (2) McGilley's economic-based decision to cut costs in the region he had recently been placed in charge of (which itself constitutes a RIF), Plaintiff's situation is the same: she must identify facts in the record that would allow a jury to decide she was selected for termination because of her gender. The record is simply devoid of such facts.

## B. Retaliation

Plaintiff also contends her termination was retaliation for her 1991 administrative charge filed with the EEOC and the Missouri Human Rights Commission. A prima facie case of retaliation requires Plaintiff to identify evidence demonstrating "(1) she engaged in statutorily protected conduct; (2) there was an adverse employment action; and (3) a causal connection exists between this conduct and the adverse action." Cheshewalla v.

Rand & Son Const. Co., 415 F.3d 847, 851 (8th Cir. 2005). Plaintiff can satisfy the first two components but not the third. Time alone is rarely sufficient, and is certainly insufficient when the lapse of time is as long as the one in this case. Cf. id. 851-52. Plaintiff offers no explanation as to why there is a connection between her 2001 charge and her 2003 termination.

### III. CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment is granted.
IT IS SO ORDERED.

DATE: February 23, 2006

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT

7